Spokane Dry Goods Company v. Commissioner.
Spokane Dry Goods Co. v. Commissioner
Docket No. 110023.
United States Tax Court
1943 Tax Ct. Memo LEXIS 358; 1 T.C.M. (CCH) 921; T.C.M. (RIA) 43182; April 19, 1943
*358 Roger L. Shidler, Esq., 1800 Exchange Bldg., Seattle, Wash., for the petitioner. B. H. Neblett, Esq., and C. R. Maxwell, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined a deficiency in income tax for the year 1939 in the amount of $4,815.61. The deficiency is contested only in part. The only question is whether petitioner realized income in the amount of $23,572.28 from the collection of insurance policies. The return was filed with the collector for the district of Washington. Findings of Fact Petitioner is a Washington corporation, having its principal place of business at Spokane, Washington. It operates a retail department store in Spokane. During the taxable year, petitioner kept its books and filed its return on the accrual basis. Prior to 1933, petitioner made cash investments in the capital stock of the Seattle Dry Goods Company, hereinafter called Seattle, in the amount of $254,779.19, as follows: Prior preferred stock
$142,066.25
2nd preferred stock
4,100.00
3rd preferred stock
107,016.94
Common stock
1,596.00
Total
$254,779.19
For a number of years prior to 1933, Seattle owned and operated *359 a department store in Seattle, Washington. Petitioner and Seattle were interrelated companies. The president and vice-president of both companies were James L. Paine and E. A. Shadle. During the years 1931, and 1932, Seattle suffered large losses. Unsuccessfull attempts were made to raise money and to sell the business of Seattle as a going concern. Petitioner believed that the bankruptcy of Seattle would be detrimental to its own interest, and that the best course to be followed was for it to purchase Seattle's stock of merchandise and to dispose of such merchandise through its own store in Spokane. On January 23, 1933, at a special meeting of the common stockholders of Seattle, a resolution was adopted which stated inter alia: WHEREAS this corporation is not able to continue business owing to lack of capital and finances. AND WHEREAS the expense of conducting business is much greater than the amounts realized from the sales of merchandise and the corporation has received an offer from the Spokane Dry Goods Company to purchase all of its assets, including merchandise on hand, accounts receivable, notes receivable, all life insurance policies, all claims of every nature, kind *360 and description and all other assets belonging to the said company. AND WHEREAS it is for the best interests of the corporation that said offer should be accepted and creditors thereby paid. NOW THEREFORE BE IT RESOLVED that the President, Vice-President, and Secretary-Treasurer of this company be and they are hereby authorized to sell all merchandise on hand belonging to this company at such time as they deem it advisable, to the Spokane Dry Goods Company at a price of not less than fifty cents on the dollar of valuation per the merchandise inventory; and they are further authorized to sell and transfer the accounts receivable, notes receivable, claims, choses in action, life insurance policies on the lives of any of the officers of the company, and all property real or personal, and assets of every nature, kind, and description, to the Spokane Dry Goods Company. * * * That after paying the creditors, or satisfying said creditors, in the amount due them as shown by affidavit of the Secretary-Treasurer in the form required by the sales in bulk statute of the State of Washington, the purchaser be allowed to offset the balance of the agreed purchase price against any amount due and *361 owing to it from this company. On January 23, 1933, the board of trustees of Seattle adopted a similar resolution. The total of the outstanding capital stock of Seattle was in the amount of $845,818.60, of which amount petitioner owned $254,717.59. There was outstanding common stock of 10,222 shares of which petitioner owned 3,190 shares. Petitioner was a minority stockholder of Seattle. Petitioner and Seattle executed an "Agreement of Sale" as of January 31, 1933. This agreement stated, inter alia: It is agreed * * * that the Seattle Dry Goods Co. will sell, assign, transfer and convey to the Spokane Dry Goods Company all of its property, including its stock of goods, wares, and merchandise, accounts receivable, notes receivable, claims, choses in action, life insurance policies on the lives of any officers of the company and all other property, real, personal or mixed, and assets of every nature, kind and description for a total price of $152,715.00 pursuant to resolutions adopted * * * on January 23, 1933, the said amount being the estimated actual value of the said assets, based upon the financial statement of the company as of January 19, 1933. * * * * *
It is further *362 agreed that the Seattle Dry Goods Co. will, through its proper officers, make and execute an affidavit as required under the Bulk Sales Statute of the State of Washington and file the same in the office of the County Auditor of King County, Washington, listing therein all of its creditors to whom there is due and owing any sum or sums whatsoever, and the said vendee upon said bills of sale being executed and merchandise delivered, will pay or cause to be paid to the said creditors, except the Dry Goods Realty Company of Spokane, the full amounts due them as shown by said Bulk Sales Affidavit, and the Spokane Dry Goods Company agrees that it will secure to the Dry Goods Realty Company payment of the claim or claims due it and will save The Seattle Dry Goods Co. harmless from any claims by the Dry Goods Realty Company of Spokane or its successors or assigns. It is further agreed that after making payments, as specified, the Spokane Dry Goods Company may offset the balance of the purchase price against the amounts due and owing from The Seattle Dry Goods Co. to the Spokane Dry Goods Company and apply any and all monies to such indebtedness. The Dry Goods Realty Company was a corporation *363 which held title to real estate in which petitioner conducted its business. Petitioner owned some of its stock and the principal stockholders of the two companies were the same persons. It was a creditor of Seattle. Seattle's stockholders executed their consent to the sale of Seattle's assets to petitioner as follows: The undersigned, stockholders of Seattle Dry Goods Co., a corporation, realizing the fact that the assets of the corporation could not be reduced to cash at a price which would leave any equity for the stockholders, and desiring to avoid insolvency proceedings, hereby consent that the Spokane Dry Goods Company acquire any or all of the assets of The Seattle Dry Goods Company, either by purchase from the corporation, or from an assignee or trustee in bankruptcy or receiver. A bulk sales affidavit was executed by Seattle through its treasurer, as of January 31, 1933, which listed its creditors, as follows: Name
Address
Amount
Dry Goods Realty Company
Spokane, Washington
$ 98,797.05
Spokane Dry Goods Co.
Spokane, Washington
40,540.04
Commercial Credit Company
Chicago, Illinois
15,008.80
Pacific Telephone & Telegraph Co.
Seattle, Washington
1,335.00
$155,680.89
*364 Seattle executed a "Bill of Sale and Assignment" as of January 31, 1933, which recited that it transferred and sold all of its assets, including insurance policies, to petitioner in consideration of the sum of $152,715. On or about January 21, 1933, all the assets of Seattle, including certain policies of life insurance were transferred to petitioner. Seattle retained no assets after the transfers were made to petitioner. The assets, other than the insurance policies were set up on petitioner's books at a value of $152,715, and subsequent profit and loss from the liquidation of the assets transferred was computed on that basis. The assets transferred to petitioner were disposed of in the regular course of its business. Creditors of Seattle were paid $152,715, including petitioner, except that there remained unpaid $2,054.26 of the amount owing to petitioner. All the assets of Seattle were disposed of during the year 1933. Among the assets transferred to petitioner were insurance policies on the life of A.G.M. Fraser, an officer of Seattle, in the total face amount of $60,000. These policies had been taken out by Seattle. In the transfer of such policies, the name of the beneficiary *365 was changed from Seattle to petitioner. At the time the insurance policies were transferred to petitioner, they were subject to policy loans in the amount of $30,460, which amount was equal to their cash-surrender values. The policies were regarded as of no value by petitioner and Seattle at the time of the transfer. The insurance policies were set up on petitioner's books as of the data of acquisition in the following way: an account for the policies was debited with the amount of the cash-surrender value at the date of acquisition, and a "loans payable account" was credited with the same amount for the outstanding policy loans so as to set up a liability. Petitioner paid premiums on the policies in the amount of $5,967.15 and repaid the loans on the policies in the amount of $30,460. Petitioner intended to pay the premiums on the policies as long as the policies were outstanding. All the insurance policies were on the life of Fraser, who was approximately 60 years of age at the time petitioner acquired the policies. Upon the death of Fraser on August 5, 1939, petitioner collected $60,000 on the policies. Opinion The only question is whether petitioner acquired the insurance *366 policies for a valuable consideration, and if so, what was the actual value of the consideration. The question arises under a provision of section 22(b)(2) of the Revenue Act of 1938, which is as follows: * * * In the case of a transfer for a valuable consideration, by assignment or otherwise, of a life insurance, endowment, or annuity contract, or any interest therein, only the actual value of such consideration and the amount of the premiums and other sums subsequently paid by the transferee shall be exempt from taxation * * * Respondent determined that petitioner acquired the policies for valuable consideration and that the net proceeds of the policies in the amount of $23,572.85 were income to petitioner. Respondent computed the net proceeds of the policies by subtracting the amounts of $30,460 and $5,967.15 from the total amount of $60,000 collected on the policies. There is no dispute as to these amounts. Petitioner contends that it did not acquire the insurance policies for a valuable consideration and, in the alternative, if it did acquire the insurance policies for a valuable consideration, the consideration was its investment in the capital stock of Seattle. Petitioner *367 relied on . In the Lambeth case the respondent agreed that petitioner had given valuable consideration for the contract under which two insurance policies were assigned and made payable, respectively, to his estate and to himself, and that the consideration was the investment of $75,000 in the stock of the Lambeth & Eskridge Motor Co. Respondent does not admit that petitioner's investment in the capital stock of Seattle was the consideration given for the transfer of the insurance policies in the instant case. Also, this case is distinguishable from the Lambeth case in that there was no sale of the assets of the Lambeth & Eskridge Motor Co. to its stockholders, in the Lambeth case. That company was liquidated and all of its assets were disposed of. Prior to the liquidation of the assets the insurance policies were assigned to Lambeth, and, thereby were separated from the assets which were liquidated. Under the facts of the Lambeth Case, there was a transfer of policies to a stockholder for a consideration consisting of his investment in the stock of the company. No such facts are present in this case. *368 The Lambeth case is not controlling here. In this case there was a sale of property to petitioner and the bill of sale, and the resolutions relating to the sale specifically included the insurance policies among the properties sold. The total consideration for all the properties conveyed was $152,715. After the sale, Seattle retained no assets. Its other assets, consisting of furniture and fixtures, were conveyed to its landlord under its lease obligations. The fact that petitioner, the vendee of the property, was a stockholder is immaterial. It did not receive the insurance policies in a distribution of the property in liquidation or in any other kind of distribution. It was not possible for Seattle to make a distribution of the policies, as a distribution in property to a stockholder. The policies went out of the ownership of Seattle under a sale and no other conclusion is supportable under the facts. Petitioner acquired a bundle of properties, of diverse kinds, including the policies, for $152,715. The terms of the contract of sale are controlling and the question is decided with due regard for the sale contract. Petitioner intended to liquidate all of the property it acquired *369 under the sale contract and carried the properties on its books in such way that the gain or loss from the liquidation was to be computed on a cost basis of $152,715. It is immaterial that petitioner excluded the insurance policies, on its books, from the rest of the property acquired, and carried the rest of the properties on its books at a "cost" of $152,715. A separate account was set up relating to the policies whereby the policy loans were a liability of petitioner. At the time the first premiums on the transferred policies were due, petitioner decided to pay the loans. However, since petitioner originally set up an account on its books as a liability for the loans, it appears that it intended from the start to pay the loans and to carry the policies. The policies were treated as having a value of zero at the date of acquisition, since the cash-surrender value equalled the amount of the policy loans. Such situation, of course, does not mean, necessarily, that the policies had no value. See ; . All of the economic benefits of a policy of insurance must *370 be taken into consideration in determining the value thereof, and cash-surrender value, loan value, and such are only some of the property interests inherent in ownership of an insurance policy. Apparently, petitioner thought that the policies had some value. This is borne out by the facts that petitioner paid off the policy loans, paid the premiums on the policies, and intended to continue paying the premiums as long as the policies were outstanding. Anything realized upon the policies above the amounts expended to repay the policy loans and pay current premiums to keep the policies alive constituted a receipt on the liquidation of some of the properties acquired from Seattle, to wit, the insurance policies. There is no evidence to show what the total receipts were from the liquidation of all of the properties received from Seattle. Such total liquidation receipts may have been less or more than the consideration of $152,715. Insofar as petitioner stood to gain or lose on the purchase of a bundle of properties for $152,715, it was bound to treat the net receipts from the policies, upon their maturity, in the same way that it treated the receipts from the liquidation of the other *371 properties acquired from Seattle. Petitioner's net gain or loss from the purchase of all of the properties certainly had to be computed by including the net liquidation receipts from the policies with the net liquidation receipts from all the other properties. The "Agreement of Sale and Assignment" provided that petitioner should pay the purchase price of $152,715, first, to the other creditors of Seattle in satisfaction of their claims, and, the balance, if any, in satisfaction of its own claim. The above amount was paid to Seattle's creditors and all of Seattle's indebtedness was satisfied except $2,054.26 of the amount owed to petitioner. The record indicates that petitioner was allowed a bad debt deduction of $2,054.26. Thus it appears that any further reason for transferring the policies to petitioner, along with the other assets, would be because of a debtor-creditor relationship, in satisfaction of a debt owing to petitioner, and not because of petitioner's stock interest in Seattle. No evidence has been submitted to show that Seattle intended or took any corporate action to make a distribution of any assets to any stockholder. Actually, Seattle made no distribution to its *372 stockholders. The evidence clearly shows that the stockholders considered their interests in Seattle of no value and consented to a sale of the assets to petitioner, free of their interests, as a means of avoiding bankruptcy and not as a distribution. This reasoning, which we think is dictated by the facts of the sale transaction, excludes a possibility that petitioner received the policies as a partial liquidating dividend in part payment of its stock in Seattle, or that petitioner received the insurance policies by virtue of its ownership of stock in Seattle. Cf. The fact that petitioner was a minority stockholder in Seattle also militates against the view that it received the policies by virtue of its stock ownership in Seattle. This is further borne out by the testimony of petitioner's witness that Seattle would have sold its assets to an outsider for $152,715. It follows that the investment of petitioner in stock in Seattle was not the consideration which was paid for the policies. The consideration paid for the policies was the consideration paid for all of the properties, including the policies, acquired from Seattle, *373 to wit, $152,715, plus $30,460 paid for the policy loans. The facts refute the argument that no consideration was given for the policies. Consideration was given and the pertinent part of section 22(b)(2) is applicable. Section 22(b)(2) provides that where an insurance contract is acquired for a valuable consideration the actual value for such consideration is to be excluded in determining the amount of the proceeds which is to be included in the gross income. The question, therefore, is, what was the consideration paid? It does not aid petitioner to say that no part of the total consideration of $152,715 was assigned to the policies. That is not material. The policies themselves had some potential value as contracts, and petitioner expected to realize some return from them depending upon the length of the remainder of the life time of the insured. Petitioner has the burden of proving the value of the consideration given for the policies. Petitioner did not submit any evidence as to the actual value of the consideration paid for the policies. Other than this amount, petitioner has failed to show the value of other consideration paid for the policies. Respondent's determination is *374 sustained. Decision will be entered for the respondent.